UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JACK T. CRAWFORD,

                           Petitioner,                               Case No. 1:05-cv-811

v.                                                  Honorable Robert Holmes Bell

DOUG VASBINDER,

                           Respondent.

_____/

## REPORT AND RECOMMENDATION

       This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254. Petitioner is serving two parolable life terms of imprisonment, imposed by the Kent County

Circuit Court on November 22, 1999, after a jury convicted Petitioner, as a fourth felony offender

under MICH. COMP. LAWS § 769.12, of two counts of first-degree criminal sexual conduct, MICH.

COMP. LAWS § 750.520b(1)(a) and (b). In his *pro se* petition, Petitioner raises five grounds for relief,

as follows:

       I.       PETITIONER WAS DEPRIVED OF FIFTH, SIXTH, AND FOURTEENTH
                 AMS CONST: BY BEING DEPRIVED OF FAIR JURY TRIAL, NOT
                 HAVING JURORS OF PEERS, ETHNICS, AND A FAIR CROSS
                 SECTION OF HIS COMMUNITY.[1]

---

[1]In his initial habeas application, Petitioner raised the above challenge to the jury venire, contending that he was deprived of his right to a fair trial by a jury drawn from a fair cross-section of the community. Because Petitioner's habeas application was not filed on the proper form and was missing certain essential information, the Court ordered Petitioner to file an amended petition on the current form provided by the Court. (Docket #4.) In his amended petition, Petitioner neglected to include his challenge to the jury venire. (*See* docket #5.) On November 12, 2008, the Court issued an order directing Petitioner to file an affidavit indicating whether he intended to include his jury venire claim in his amended application for habeas corpus relief. (Docket #39.) Petitioner filed the required affidavit on November 21, 2008, indicating his intent to raise a jury venire claim as an issue in his amended petition. The Court therefore has included the claim as stated in the initial petition. (Docket #1.)

II.     HE WAS DEPRIVED OF A FAIR JURY TRIAL AND PREJUDICE BY COURT PERMITTING PROSECUTOR TO ELICIT TESTIMONY THAT HE FAIL[ED] TO TAKE A POLYGRAPH.

III.    AUDIO/STATEMENTS SHOULD HAVE BEEN SUPPRESSED BEING INVOLUNTARY WHERE WIFE COERCED PETITIONER TO ADMIT GUILT BY THREAT OF LEAVING HIM AND TRIAL COUNSEL BEING INEFFECTIVE FOR ASKING SUPPRESSION ON THE GROUNDS PETITIONER CRAWFORD STATEMENTS WERE INADMISSIBLE, BECAUSE HIS WIFE WAS ACTING ON BEHALF OF POLICE (AGENT) AT THE TIME OF A TAPED PHONE VOICE CONVERSATION DELIBERATELY TRYING TO GET A CONFESSION. SHE WAS A STATE ACTOR WHO MADE USE OF HER PRIOR COERCION. (2) INVOLUNTARINESS OF STATEMENT WAS BROUGHT TO THE COURT'S ATTENTION, AND BECAUSE COUNSEL FAIL TO PRESERVE OR DEVELOP NECESSARY RECORD OF IT CONSTITUTES INEFFECTIVENESS OF A COUNSEL CLAIM.

IV.    PETITIONER WAS DEPRIVED [OF HIS] FUNDAMENTAL RIGHT TO PRESENT DEFENSE BY STATE WITNESSES SPECULATING ABOUT ISSUES TOUCHING ON COMPLAINTIFF'S [SIC] (NYDIA) CREDIBILITY AND PREVENTING DEFENSE FROM ELICITING OPINION TESTIMONY FROM OTHER WITNESSES.

V.     THE ACCUMULATION OF ERRORS "DOCTRINE" HERE DEPRIVED THE PETITIONER MR. CRAWFORD OF A FAIR TRIAL BY JURY.

Respondent filed an answer to the petition (docket #17) stating that the grounds should be denied because they are either noncognizable, procedurally defaulted or have no merit. Upon review and applying the AEDPA standards, I find that Petitioner's grounds are without merit. Accordingly, I recommend that the petition be denied.

**Procedural History**

    A.    **Trial Court Proceedings**

The state prosecution arose from Petitioner's multiple acts of sexual intercourse with his step-daughter between 1991 and 1996, when she was between seven and fourteen years old.

Petitioner was charged with two counts of first-degree CSC.   Petitioner waived preliminary examination and, on February 3, 1999, he was bound over on both charges.   A supplemental information was filed charging Petitioner as a habitual offender, fourth offense.   Petitioner was tried before a jury beginning October 4, 1999, and concluding on October 7, 1999.

On the first day set for trial, the court heard a variety of preliminary motions. (10/4/99 Mot. Tr. (Tr. I), 3, docket #23.)  Petitioner moved to have his appointed counsel removed from the case on the grounds that counsel had failed to communicate adequately, to provide discovery documents, to move for dismissal on state speedy trial grounds, or to move to strike certain telephone recordings.  He sought to represent himself.  (Tr. I, 4-12.)  Petitioner also argued that his confession was not voluntary because it was induced by coercion, an argument not raised by counsel. (Tr. I, 11.)  The prosecutor advised the court that counsel had moved before the prior judge in the proceeding to suppress the recording of a telephone conversation made by Petitioner's wife with the assistance of the police.  The prior judge had ruled the recording admissible.  (Tr. I, 13.)

After hearing multiple arguments, the court noted two possible bases for removal of counsel: (1) that there had been a breakdown in the relationship between Petitioner and counsel, and (2) that counsel had been ineffective.  The court rejected the notion that Petitioner could declare a breakdown any time an attorney did not do everything Petitioner wanted.  The court also held that counsel had been diligent and effective, that he was not required to make frivolous requests of the court, and that Petitioner had not made counsel aware of witnesses until the day of trial.  (Tr. I, 26-28.)  The court further found that a motion to dismiss for violation of the 180-day speedy trial rule would fail, as Petitioner already was incarcerated on another offense and the rule therefore did not apply to him.  (Tr. I, 28.)  Further, all of the delays had been at the request of the defense, so the case

- 3 -

was not beyond the 180 days.  (Tr. I, 28.)  In addition, the court found that counsel had properly moved to suppress the tape recording and that Petitioner was not entitled to a new attorney simply because he was unhappy with the court's ruling on that motion.  (Tr. I, 29.)  Petitioner became disruptive and argumentative, and the court repeatedly cautioned him not to interrupt.  (Tr. I, 6-7, 9, 29, 30, 31, 32, 33.)  The court cautioned Petitioner about representing himself and advised him that trial would begin the following morning, at which time Petitioner would be required to make one of three choices: (1) continue to have the services of his attorney by his own choice; (2) represent himself, if he could do so in a civil manner; or (3) if he could not behave, have his attorney represent him in the courtroom while Petitioner remained in a separate conference room listening to the proceedings over a monitor.  (Tr. I, 38-40.)

The following morning, Petitioner apologized for his rude behavior of the preceding day and expressed his intent to represent himself.  (10/5/99 Tr. (Tr. II), 3, docket #24.)  Petitioner again raised objections to the failure of counsel to provide discovery, to obtain telephone records and to proceed to trial without forfeiting the 180-day rule.  (Tr. II, 4-9.)  The court ruled that it was satisfied that the matter had been properly handled.  The court again advised Petitioner that self-representation was ill-advised, but permitted Petitioner to represent himself as long as he behaved in a civil fashion.  (Tr. II, 10.)  Petitioner made a motion to strike the tape-recording as an illegal third-person recording under Michigan law.  (Tr. II, 14.)  The motion was denied because a party to a conversation may record that conversation under Michigan law.  (Tr. II, 14-15.)

Thereafter, the court addressed in more detail Petitioner's objections about his attorney.  The court reviewed the records of other files involving Petitioner in which he had raised similar objections concerning three other attorneys and in which he complained those attorneys had

declined to file similarly frivolous motions.  (Tr. II, 18-20.)  The court held that a review of those records confirmed its prior decision that Petitioner was attempting to manipulate the system in an effort to delay and hopefully obtain a more desirable settlement.  (Tr. II, 21-22.)  For the same reasons, the court denied Petitioner's request to adjourn the case so that he could prepare to try it himself.  (Tr. II, 22-23.)

During voir dire, Petitioner raised questions about the composition of the jury venire:

THE DEFENDANT:  Your Honor, can I ask a question?  Are the jury of your peers apply to this courtroom, your Honor, or not?

THE COURT:  Of course, the Constitution of the United States applies here.

THE DEFENDANT:  That's within my ethics [sic] and my age group and things of that nature?

THE COURT:  No. That's not what it means.

THE DEFENDANT:  That's not?

THE COURT:  It simply means that everybody in the community has an equal chance of being called to be a juror here, and that's plainly the way we arrange things.

THE DEFENDANT:  Thank you, your Honor, for the clearance.

(Tr. II, 68-69.)

After jury selection but before the jury was sworn and seated in the courtroom, the court heard Petitioner's motion to exclude the tape recording on the grounds that it had been altered. (Tr. III, 23.)  Paula Crawford, Petitioner's estranged wife, testified about a recording she made of a telephone conversation that she had with Petitioner.  She obtained the recording device and telephone set from the Grand Rapids Police Department on December 28, 1998.  (Tr. III, 25.)  After the instruments had been installed, Paula Crawford waited for Petitioner to call her.  When he called,

she pressed the record button.  (Tr. III, 26.)  She had the recorder on her phone for two or three days and she recorded the entire conversations she had with Petitioner.  (Tr. III, 26.)  She called Detective Khris Westmoreland, and Detective Karl Holtzheuter picked up the tape and recorder from Mrs. Crawford's home.  Mrs. Crawford denied altering the tape in any way before turning it over to the detective.  (Tr. III, 27.)

Officer Khris Westmoreland stated that she had previously testified at a hearing concerning the admissibility of the tape.  (Tr. III, 31.)  She testified that she had no knowledge of the tape having been altered.  She stated that the Crawford's phone had a call-waiting feature at the time, and she testified that the tape sounded like they had clicked over from another call and may have tried to press the record button before the conversation started.  (Tr. III, 32.)

In order to further explore the testimony of the earlier hearing, Petitioner called his former attorney, Damian Nunzio.  Nunzio testified that he did not recall having heard any testimony regarding the tape being altered or tampered with.  He believed there had been testimony that the tape had been used on prior occasions and earlier recordings had been taped over.  (Tr. III, 34.) Nunzio further testified that he had listened to the entire tape and heard no interruptions or static, and the tape included only a conversation between Petitioner, Mrs. Crawford and Nydia Ray.  (Tr. III, 37.)

After reviewing the tape and hearing the testimony, the court found that no basis existed for concluding that the tape had been altered.  (Tr. III, 40.)  The court therefore ruled that the tape would be played for the jury and a transcript would be provided as an aid to the jury.  (Tr. III, 41.)

- 6 -

After preliminary instructions and opening statements, the prosecution called Paula Crawford as its first witness before the jury.  (Tr. III, 89.)  Mrs. Crawford testified that in 1991, she and her seven-year-old daughter, Nydia Ray, lived with Petitioner.  Mrs. Crawford and Petitioner slept on the floor of the living room on a mattress in front of the couch.  Nydia slept in her own bedroom.  (Tr. III, 92.)  Between 1991 and 1996, she observed that Nydia became afraid frequently and did not like Petitioner.  (Tr. III, 94.)  She often wanted her mother to sleep with her and she asked for a lock on her bedroom door.  (Tr. III, 94.)  Mrs. Crawford tried to put a lock on the door but could not do so.  (Tr. III, 95.)  When Nydia was 13 years old, shortly after she left for school in the morning, Child Protective Services called the house and told Mrs. Crawford that they were taking Nydia from her home and placing her with her natural father, Anthony Ray.  (Tr. III, 95-96.)  Mrs. Crawford asked Petitioner, "You didn't mess with Nydia, did you?"  (Tr. III, 96.)  Petitioner denied any sexual conduct.  Mrs. Crawford called Anthony Ray and asked to speak with Nydia.  Eventually, Nydia told her what happened.  Mrs. Crawford testified that she initially did not believe Nydia because she had never seen anything.  (Tr. III, 96.)  After a couple of months with her father, Nydia moved back with Mrs. Crawford and Petitioner.  (Tr. III, 97.)  Nydia told Mrs. Crawford about the sexual abuse again, when she became upset that Petitioner was still in the home.  (Tr. III, 98.)  In December 1998, Petitioner called the house and Nydia became really upset.  She told Mrs. Crawford specifics about the abuse and, based on Nydia's descriptions of anal sex and the pain on Nydia's face, Mrs. Crawford came to believe that the abuse had occurred.  (Tr. III, 98-99.)  She took Nydia to the police and met with Detective Khris Westmoreland.  (Tr. III, 99.)  Mrs. Crawford told Westmoreland that Petitioner had admitted to her that he had had sex with Nydia.  (Tr. III, 100.)  She believed she could get Petitioner to admit again that he had had intercourse with Nydia, and she

wanted to have evidence of the conversation.  (Tr. III, 100.) Westmoreland gave Mrs. Crawford a telephone, recorder and tape and instructed Crawford with their use.  (Tr. III, 99.)  The prosecutor then played the entire tape to the jury.  (Tr. III, 102.)  Mrs. Crawford identified the recording as the one she had made and identified her own and Petitioner's voices.  (Tr. III, 102.)  She testified that breaks in the tape occurred when the phone from the jail cut off the call and Petitioner would call back.  She denied altering the tape in any way.  (Tr. III, 109.)  The tape included the following conversation between Petitioner and Nydia Ray:

> MR. CRAWFORD:  Baby, I'm sorry.  I'm sorry (crying) I'm sorry.

> NYDIA RAY:  Okay.

> MR. CRAWFORD:  God, I'm sorry.  I was sick.

> NYDIA RAY:  I know.

> MR CRAWFORD:  I'm sorry.

> NYDIA RAY:  I was just wondering why you did that to me all them years.

> MR. CRAWFORD:  I'm sorry.  I ain't got the last, but I'm sorry.  Please, forgive me, if you ever can.

> . . .

> NYDIA RAY:  The day I had said something to my school about it.

> MR. CRAWFORD:  Uh-huh.

> NYDIA RAY:  Everything, I just felt that it was – that it was time I guess time for you – I was tired of it.

> MR. CRAWFORD:  Yeah, yeah.

> NYDIA RAY:  And so I thought it was time for me to get a break and move on and time for you to get a break.

> MR. CRAWFORD:  Yeah.

NYDIA RAY:  You know, so you could, you know, stop doing that.

MR. CRAWFORD:  Yeah, I don't have no fault against you, Nydia.  And again, I'm sorry.  I really am, girl.  I don't hold nothing against you, you know.

(Tr. V, 83-85.[2])  During a break from the playing of the tape, Petitioner requested that counsel resume representing him.   The court allowed counsel to resume representation with the understanding that Petitioner would not be allowed to reassert his right to represent himself.  (Tr. III, 105-08.)

On cross-examination, Mrs. Crawford testified that she could not remember precisely when Nydia told her that she had been subjected to anal and vaginal intercourse, in addition to oral sex.  (Tr. IV, 8-11.)  She testified that she loved Petitioner and knew that he loved her and would do anything for her.  (Tr. IV, 20.)  She acknowledged that Petitioner repeatedly denied the allegations during conversations with her, including numerous conversations between October 1998 and December 1998. (Tr. IV, 21-22.) On the one occasion in October 1998 on which Petitioner admitted sexually abusing Nydia, Mrs. Crawford had threatened to stop seeing him if he did not tell the truth. (Tr. IV, 23-25, 35.)  Paula Crawford acknowledged that she told the police, "It took a few phone calls . . . to get him to confess that he made Nydia suck his penis."  (Tr. IV, 29.)

On redirect, Paula Crawford again testified that Nydia was afraid of Petitioner and did not like to be alone with him.  (Tr. IV, 36.)  She explained that she had never asked Petitioner to put a lock on Nydia's door because he was not at home at the time.  (Tr. IV, 36.)

Nydia Ray testified that she was born in August 1982 and that she and her mother began living with Petitioner in 1991.  (Tr. IV, 40-41.)  She expressed some confusion about whether

---

[2]While the tape was not transcribed when first played to the jury, the excerpted portions were replayed during the prosecutor's closing argument and were transcribed at that time.

she was seven or nine years old at the time of abuse in 1991, but she clarified that she was under the statutorily relevant thirteen years. (Tr. IV, 41-43.) According to her testimony, on the first occasion of sexual abuse, Petitioner made her get on the couch and he had anal sex on her. (Tr. IV, 43, 45.) He made her get into the bathtub afterward. (Tr. IV, 45.) She described the incident as painful. (Tr. IV, 46.) Petitioner performed anal sex with her on a total of four occasions. (Tr. IV, 46.) She told her mother that her "behind was burnin' and [she] couldn't use the bathroom." (Tr. IV, 47.) Her mother asked why, but Nydia told her she did not know. She did not tell her mother about the sexual abuse because she was afraid of Petitioner, having seen him beat her mother. (Tr. IV, 47.) When she was older than 13, after the family had moved to a home on Castle Ridge, Petitioner made her suck his penis "[t]oo many times to count." (Tr. IV, 48.) Nydia recalled one occasion in 1996 on which she got up late for school while Petitioner was in the bathroom. She left the house and walked outside the garage. Petitioner called out, "Where are you goin'?" She told him she was going to her friend's house. He called her saying, "Come here, I want you to do somethin' for me." She went back into the house, and Petitioner dropped his pants, put his hand on the back of her head, and made her suck his penis. (Tr. IV, 52.) After she finished, she went to her friend's house, where Petitioner called her. (Tr. IV, 52.) Her friend had already taken the bus, and Nydia arrived at school late. About an hour-and-a-half after she arrived at school, she got fed up and went to her counselor. She told her counselor what had happened, but she lied and said it had only happened once. (Tr. IV, 52-53.) Her counselor called Child Protective Services. Nydia did not return home, but went to live with her biological father for five months. (Tr. IV, 53.) She returned to her mother's house, but not when Petitioner was there. (Tr. IV, 54.) Nydia spoke with her mother while she was away, and her

mother came to believe Nydia was telling the truth.  (Tr. IV, 56.)  When Nydia returned home, Petitioner was no longer living in the house.  (Tr. IV, 54.)

        In 1998, Nydia again moved back in with her father for about four months, and she was not aware that her mother had begun to see Petitioner again.  (Tr. IV, 56, 58-59.)  Nydia was back home with her mother on Christmas day 1998 when Petitioner called.  (Tr. IV, 55.)  She heard his voice and got very upset.  (Tr. IV, 55.)  She told her mother that she felt like Petitioner should pay for what he had done to her.  (Tr. IV, 56.)  Her mother called someone, and they went to the Children's Assessment Center and spoke with Detective Westmoreland.  (Tr. IV, 58.)  Detective Westmoreland gave them recording devices for the phone, and she learned how to use them when her mother was instructed.  (Tr. IV, 59.)  A portion of the tape was played, and Nydia identified Petitioner's voice and her own.  (Tr. IV, 60.)  She testified that the recording sounded like part of the conversation of which she had been a part.  (Tr. IV, 60.)  She recalled Petitioner saying, "Please tell your mother the truth.  We ain't never did nothin' but head."  (Tr. IV, 60-61.)  At another point, Nydia got back on the telephone with Petitioner and he apologized to her.  (Tr. IV, 63-65.)  After the tape was made, Nydia acknowledged going to visit Petitioner at the jail.  She stated, however, that she was going to see her boyfriend and that her mother drove her.  After visiting her boyfriend, her mother asked her to go up and see Petitioner.  Nydia went with her mother but sat in another booth because she did not want to see his face.  (Tr. IV, 66-67.)  While she was there, he wanted to know why she was lying, she assumed about her allegations of sexual abuse.  (Tr. IV, 68.)  She discussed a portion of the tape recording in which she asked Petitioner, "Remember when you hit me in the nose?"  Nydia stated that Petitioner had hit her twice.  The first time occurred when she started

crying after getting on the mattress in front of the couch. She did not want to have anal sex. When she cried, he punched her in the nose. (Tr. IV, 70.)

Detective Karl Holtzheuter testified that his partner, Khris Westmoreland, was assigned to the case. (Tr. IV, 104.) He became involved when Detective Westmoreland asked him to go out to Paula Crawford's house to set up the tape recorder on December 28, 1998. (Tr. IV, 105.) Detective Holtzheuter instructed Paula and Nydia in the use of the equipment. (Tr. IV, 106.) Two days later, he received a phone call from Paula. Detective Westmoreland was not in the office, so Holtzheuter went to Paula Crawford's home to pick up the tape. He brought it back to the office unaltered. He listened to it and turned it over to Detective Westmoreland the next day. (Tr. IV, 106.) On cross-examination, Holtzheuter testified that he was at the home for 20 or 30 minutes, during which time he also spoke with Paula Crawford, who explained something about the facts of the case. Paula Crawford mentioned that there had been a prior investigation and that she felt bad because she had not believed her daughter at that time. (Tr. IV, 108.)

Detective Khris Westmoreland testified that in December 1998, she was the Grand Rapids Police detective assigned to the Children's Assessment Center. (Tr. IV, 115-16.) On December 28, 1998, she received a telephone call from Sergeant Terry McGee, who told her that two women had appeared at the police department who wanted to report a criminal sexual conduct involving a child victim. (Tr. IV, 116.) Westmoreland met with Paula Crawford and Nydia Ray at the Children's Assessment Center that same day. She interviewed Nydia outside the presence of Paula Crawford. (Tr. IV, 116.) Westmoreland's notes from the interview reflect that, when she asked Nydia about whether she had previously talked to the police, Nydia could not remember. (Tr. IV, 117.) Westmoreland also interviewed Paula Crawford. She told both Paula Crawford and Nydia

- 12 -

Ray that these types of cases were difficult to prove because of the lack of witnesses and physical evidence. (Tr. IV, 118.)  Westmoreland did not seek a physical examination.  Under police protocol, a physical examination is requested in a criminal sexual assault case only if the assault occurred within the last 72 hours and involved penetration.  After that time, evidence would be unlikely to exist.  In the instant case, the assault had occurred years before the report was made.  (Tr. IV, 119.) Paula Crawford informed Detective Westmoreland that Petitioner had previously confessed to her. (Tr. IV, 119.)  Westmoreland suggested that the police department could set up equipment on her home telephone to allow recording of telephone conversations.  (Tr. IV, 120.)  Because of the type of telephone Paula Crawford used, the police department also needed to supply the telephone set. Detective Holtzheuter set the equipment up and showed Crawford how to operate the tape recorder. (Tr. IV, 120.)  Two days later, Westmoreland received a page from Holtzheuter, who informed her that he had picked up a tape from Paula Crawford.  Westmoreland told him to keep it until she came in the next day.  (Tr. IV, 121.)  The next day, Detective Westmoreland took possession of the tape and listened to it in its entirety.  (Tr. IV, 121.)  Westmoreland denied altering the tape in any way, and she testified that the tape played for the court was identical to the tape she had first listened to. (Tr. IV, 122.)  During her investigation, Westmoreland looked back at the prior investigation conducted by Russ Headworth.  She learned about the prior investigation just days after December 28, 1998. (Tr. IV, 122-23.)  During her initial interview with Nydia, however, she learned that Nydia had reported the abuse to a school counselor when she was 13 or 14 and that she had subsequently been removed from the home.  (Tr. IV, 123.)  She therefore was aware that at least some authorities had been involved before.  (Tr. IV, 124.)  Westmoreland testified that, in her experience, it was not unusual for child sexual abuse to go unreported for a long time and for

mothers to not believe those reports about spouses or boyfriends. (Tr. IV, 126-27.) Westmoreland reported that Nydia Ray told her that Petitioner had put cocaine in her Kool-Aid. (Tr. V, 21.) She testified that she found nothing wrong with Paula Crawford's threat to leave Petitioner if he did not admit the abuse. She stated that it is not uncommon for marriages to break up during investigations of sexual abuse. She also testified that it ordinarily is difficult to get a perpetrator to admit abuse. (Tr. V, 29-30.)

Police Officer Russell Headworth testified that he was the detective assigned to a case involving Petitioner in 1996. A polygraph was scheduled for Petitioner, but, because Petitioner felt he was made to wait too long, Petitioner left and the polygraph was not conducted. (Tr. V, 35-36.) Shortly after the scheduled date of the polygraph, Headworth advised Paula Crawford that the case was not going forward and that a warrant was not issued for lack of evidence. (Tr. V, 38-39.)

John Smith of the Family Independence Agency and Children's Protective Services testified that he was involved in Nydia Ray's 1996 complaint against Petitioner. (Tr. V, 43.) Smith concluded that there existed a preponderance of the evidence that Nydia had been sexually abused by Petitioner. He made sure that Petitioner was not in the same home with Nydia, and he referred her for counseling to the YWCA Sexual Abuse Counseling Center. (Tr. V, 43-44.) Smith also referred the case to the police, and he was present for an interview with Petitioner that was conducted at Headworth's office. (Tr. V, 44.) At that time, Petitioner did not admit any sexual involvement with Nydia Ray. (Tr. V, 44.) Smith also testified that Nydia attended counseling sessions but was not consistent with her attendance. (Tr. V, 49.) Smith testified that, based on his experience, teenagers frequently did not admit all of the abuse during the first interview. Subsequent disclosures frequently were made during counseling. (Tr. V, 50.) It also is common for parents initially not to

believe such allegations.  (Tr. V, 50.)  Smith testified that he did not substantiate all cases involving allegations of child sexual abuse.  (Tr. V, 50-52.)

Detective Westmoreland was recalled to the stand.  She testified that she had made an error in testifying that Nydia Ray had told her that Petitioner put cocaine in her Kool-Aid.  According to Westmoreland's notes, Nydia used the word "drug."  It was Paula Crawford who used the word "cocaine."  (Tr. V, 55.)

Assistant Kent County Prosecutor Edward Lis testified that he did not issue a warrant on the 1996 allegations by Nydia Ray against Petitioner on the basis of insufficient evidence.  (Tr. V, 57.)  Because at that point investigators had only Nydia's word against Petitioner's word, the case was closed for lack of evidence.  The refusal to issue a warrant does not mean that the prosecutor does not believe the victim.  (Tr. V, 58.)  In criminal sexual conduct cases, particularly those involving children, the prosecutor seeks to avoid revictimizing the complainant and looks at both probable cause to issue a warrant and the ability to prove guilt beyond a reasonable doubt.  (Tr. V, 60.)  The prosecution rested.  (Tr. V, 66.)

Outside the presence of the jury, the court considered defense counsel's renewed and preserved objection to the admission of evidence about the polygraph.  The court again held that, while defense counsel had not sought to introduce the information during his cross-examination of Paula Crawford, the information was introduced in a responsive answer to questions raised by defense counsel about the reason a warrant was declined in the 1996 investigation.  The court held that the introduction of the testimony that Petitioner had offered to take a polygraph, coupled with the denial of the warrant, could lead a jury mistakenly to conclude that Petitioner passed a polygraph.  The court therefore allowed the accurate history of the polygraph to be introduced.  The court also

indicated that it would instruct the jury that the information about the polygraph was for the limited purpose of dealing with a mistaken impression they may have had and that they were not to use the evidence for any other purpose.  (Tr. V, 67-71.)  Petitioner moved for a mistrial on the ground of the polygraph.  The court denied the motion.  (Tr. V, 72.)

At defense counsel's request, the court also thoroughly instructed Petitioner with respect to his rights concerning his decision whether to take the stand.  (Tr. V, 73.)  Petitioner stated that he did not intend to testify.  He also asked for a directed verdict and stated that he wanted YWCA counselors brought as witnesses as to what Nydia may have said during counseling.  (Tr. V, 73.)  In addition, Petitioner complained that Officer Headworth had lied about Petitioner's demeanor when he appeared for a scheduled polygraph because Headworth was not present.  (Tr. V, 73-74.)  Finally, he alleged that he was being misled by his attorney and that defense counsel was not adequately cross-examining witnesses on Petitioner's behalf.  (Tr. V, 74.)  The court advised Petitioner that defense counsel had done an extremely good job of defending Petitioner and that Petitioner was much better off than he would have been representing himself.  (Tr. V, 74.)  The court reiterated that it would not allow a second defense by Petitioner, but it addressed some of his concerns.  The court advised Petitioner that defense counsel could not be held responsible for what a witness says on the stand just because the attorney cannot get the witness to admit he was lying.  (Tr. V, 75.)  The court also noted that the polygraph interview room was equipped with a one-way mirror through which an observer could have viewed the proceedings.  Further, the court denied the directed verdict.  (Tr. V, 75-76.)  Finally, the court refused to order the prosecutor to call the YWCA counselors as witnesses.  The court noted that it was the defense that raised all of the issues about the YWCA counselors and held that the prosecutor was not obliged to produce witnesses to

everything a defendant introduces.  In addition, the court noted that counseling information was privileged and could not be released absent particularized showings not made in the case.  (Tr. V, 76.)  The prosecutor advised the court that John Smith had informed her that he had a document clarifying that, while he had thought Nydia attended counseling, she had not.  The court determined that it would address the situation by stipulation.  (Tr. V, 78.)

The defense rested.  (Tr. V, 79.)  The court then instructed the court that there had been testimony about a referral to counseling at the YWCA.  The court stated that the parties now agreed that the referral had been made but, for whatever reason, Nydia did not go to counseling.  (Tr. V, 79.)

At the conclusion of trial, on October 8, 1999, the jury found Petitioner guilty of both counts of criminal sexual conduct.  (Tr. V, 130.)  On November 22, 1999, Petitioner was sentenced as a fourth habitual offender to serve two terms of life imprisonment.  (Sentencing Transcript, (S. Tr.), 30, docket #28.)

## B.  Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief on appeal, which was filed by counsel on October 3, 2000, raised the same issues raised in grounds two through five of this application for habeas corpus relief.  (See Def.-Appellant's Br. on Appeal, docket #29.)  Petitioner filed a motion to remand, which was denied by the Michigan Court of Appeals on November 3, 2000.  (See 11/3/00 Mich. Ct. App. Ord, docket #29.)  By unpublished opinion issued on August 28, 2001, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (See 8/28/01 Mich. Ct. App. Opinion (MCOA Op.), docket #29.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same four claims raised before and rejected by the Michigan Court of Appeals.  By order entered March 4, 2002, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (See 3/4/02 Mich. Ord., docket #30.)

### C.     Post-conviction relief

Petitioner filed a premature motion for relief from judgment in the Kent County Circuit Court on February 2, 2002, while his application for leave to appeal was still pending in the Michigan Supreme Court.  The motion was denied on February 27, 2003.  (Cir. Ct. Dkt. Sheet, docket #20 at 4.)  On June 29, 2004, Petitioner filed a post-conviction motion for a new trial.  (*Id.*).  In his motion for new trial, Petitioner raised the same claim raised in his first ground for habeas relief.  The Kent County Circuit Court denied the motion on the merits on July 6, 2004.  (7/6/04 Cir. Ct. Ord., docket #31.)  Petitioner sought leave to appeal to the Michigan Court of Appeals, which denied leave on April 7, 2005, on the grounds that Petitioner had failed to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D).  (4/7/05 MCOA Ord., docket #31.)  Petitioner applied for leave to appeal to the Michigan Supreme Court.  The supreme court denied leave to appeal on October 31, 2005.  (10/31/05 Mich. Ord., docket #32.)

### <u>Standard of Review</u>

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has

"drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir.

2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant

to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits

in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved

an unreasonable application of, clearly established federal law as determined by the Supreme Court

of the United States; or (2) resulted in a decision that was based upon an unreasonable determination

of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme

Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and

not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d

at 655.  In determining whether federal law is clearly established, the Court may not consider the

decisions of lower federal courts.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th

Cir. 2000).  "Yet, while the principles of 'clearly established law' are to be determined solely by

resort to Supreme Court rulings, the decisions of lower federal courts may be instructive in assessing

the reasonableness of a state court's resolution of an issue."  *Stewart v. Erwin*, 503 F.3d 488, 493

(6th Cir. 2007).  The inquiry is "limited to an examination of the legal landscape as it would have

appeared to the Michigan state courts in light of Supreme Court precedent at the time [the

petitioner's] conviction became final."  *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that

contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are

materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a

different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent

but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

      A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

      Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *See Harris*, 212 F.3d at 943; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). Where the circumstances suggest that the state court actually considered the issue, the review is not *de novo*. *Onifer*, 255 F.3d at 316. The review remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Harris*, 212 F.3d at 943. However, the Sixth Circuit recently has clarified that where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." In such circumstances, the court conducts *de novo* review. *McKenzie*, 326 F.3d at 727 (limiting *Harris* to those circumstances in which a result exists to which the federal court may defer); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003)

(reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

       The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

### Discussion

I.      <u>Fair Cross-Section Claim</u>

       In his first ground for habeas relief, Petitioner contends that he was denied a jury selected from a fair cross-section of the community. In *Taylor v. Louisiana*, 419 U.S. 522 (1975), the Supreme Court held that "the Sixth Amendment affords the defendant in a criminal trial the opportunity to have the jury drawn from *venires* representative of the community . . . ." *Id.* at 537. In order to establish a prima facie violation of the fair-cross-section requirement, a defendant must demonstrate three elements: (1) that the group alleged to be excluded is a "distinctive group" in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. *Duren*

*v. Missouri*, 439 U.S. 357, 364 (1979).  When potential jurors are systematically excluded from the jury pool on the basis of race, structural error occurs.  *Vasquez v. Hillery*, 474 U.S. 254, 263-64 (1986).  Structural error is not subject to harmless-error review.  *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-49 (2006) (citing *Arizona v. Fulminante*, 499 U.S. 279, 309-310 (1991)).

In his motion for new trial in the Kent County Circuit Court, Petitioner based his fair-cross-section challenge on two factual bases.  First, he cited a computer "glitch" in the Kent County juror selection system that existed between the spring of 2001 and July 2002.  The problem was first made public in an article published in the *Grand Rapids Press* on July 30, 2002.  (*See* Ex. to Am. Pet., docket #5-2 at 4-5.)  During the problem period, the computer system inadvertently excluded nearly 75% of the county's 454,000 eligible jurors, resulting in the majority of jurors being drawn from the suburbs of Grand Rapids, which are overwhelmingly white.  *See Parks v. Warren*, 574 F. Supp. 2d 737, 740 (E.D. Mich. 2008) (summarizing history).  The glitch resulted in significantly fewer than expected jurors being summoned from inner-city Grand Rapids, where a substantial portion of the black population of Kent County resides.  (Mot. for New Trial, Ex. to Am. Pet., docket #5-2 at 15.)

Second, Petitioner cited the Kent County case of *People v. Diapolis Smith*, in which the Michigan Supreme Court had recently granted review, following a decision by the Michigan Court of Appeals reversing the circuit court and granted a new trial on the grounds that the defendant had demonstrated that he had been denied his Sixth Amendment right to an impartial jury drawn from a fair cross-section of the community by the Kent County procedures in existence prior to 1993.

*See People v. Smith*, No. 172558, 1999 WL 33445050 (Mich. Ct. App. 1999).[3]  (Br. in Supp. of Mot. for New Trial, Ex. to Am. Pet., docket #5-2 at 19.)  Petitioner argued to the circuit court that his trial counsel was ineffective in failing to effective the challenge the jury venire on both factual bases.

The circuit court denied Petitioner's motion on a variety of grounds.  The principal ground for denying relief to Petitioner was set forth in the opening paragraph of the circuit court's order:

> Because the computer programming error at issue in *People v Bryant*, [No. 241442, 2004 WL 513664 (Mich. Ct. App. Mar. 16, 2004)], did not occur until April, 2001, and was fully resolved by July, 2002, defendant herein cannot rely upon that error as demonstrating a systematic exclusion of African-Americans from the jury pool from which his jury was selected.  Trial in this case occurred in October, 1999. As a result, the aforesaid programming error, while just recently discovered, cannot have affected this case and, accordingly, does not provide any basis for upsetting defendant's conviction.

(7/6/04 Cir. Ct. Ord., docket #31.)  The court also concluded that the composition of the jury was evident to Petitioner at the time of trial, and Petitioner himself, acting *pro se* at that point in his trial, lodged an objection to the panel composition. The circuit court held that Petitioner had failed to attempt to demonstrate any systematic exclusion of African Americans other than the 2001-2002 computer programming error.  Because he failed to raise the claim on direct appeal, the court held that Petitioner was required to demonstrate good cause for having failed to raise the issue on appeal. The circuit court also held in that Petitioner had failed even to attempt to make a showing of good

---

[3]The Michigan Supreme Court reversed the Michigan Court of Appeals determination on the fair-cross-section claim and remanded the case to the court of appeals on the remaining issues.  *See People v. Smith*, 615 N.W.2d 1 (Mich. 2000).  On remand, the court of appeals affirmed on the remaining grounds.  *People v. Smith*, No. 172558 (Mich. Ct. App. Feb. 27, 2001).  Petitioner thereafter sought habeas review in this court, and the court denied the petition on February 23, 2006.  *Smith v. Berghuis*, No. 1:03-cv-87 (W.D. Mich. Feb. 23, 2006).  On appeal of the denial of habeas review, the Sixth Circuit recently granted habeas relief on the fair-cross-section claim, finding that African-Americans were systematically underrepresented in Kent County venires at the time of Smith's trial in 1992. *See Smith v. Berghuis*, 543 F.3d 326 (6th Cir. 2008).

cause for having failed to raise any systematic problem in the selection process, as required by MICH. CT. R. 6.508(D).  (*Id.*)

Finally, the court concluded that Petitioner's challenge to the effectiveness of trial counsel was without merit.  Because the computer programming glitch had not yet occurred and, when it did occur, was not exposed until 2002, counsel acting in 1999 could not possibly be ineffective in failing to anticipate the error.  (*Id.*)  The Michigan Court of Appeals and the Michigan Supreme Court denied leave to appeal solely on the grounds of MICH. CT. R. 6.508(D), because Petitioner had failed to demonstrate good cause for failing to raise the issue on direct appeal.

The circuit court reasonably concluded that Petitioner had failed to demonstrate his fair-cross-section claim insofar as it was based on the 2001-2002 computer problem because Petitioner's jury was drawn in 1999, before the time any computer problem occurred that has been shown to have violated the Sixth Amendment.

Moreover, to the extent Petitioner relies on the juror selection practices at issue in *Smith v. Berghuis*, 543 F.3d 326 (2008), his claim is equally futile.  The Michigan courts did not address the question, so this Court considers the issue *de novo*.  *Onifer*, 255 F.3d at 316.  The Smith case involved systematic practices in existence in Kent County prior to October 1993.  *See Smith*, 543 F.3d at 332.  Those practices ended long before Petitioner's jury was selected in 1999.  Petitioner therefore cannot rely on the evidence of systematic exclusion presented in *Smith* to prove systematic exclusion in the selection of the jury venire for his trial.

Finally, as the Kent County Circuit Court noted, Petitioner has made no attempt to demonstrate a systematic exclusion of African-American jurors from the venire except by reliance on the computer glitch in 2001-2002 and the *Smith v. Berghuis* decision.  As a consequence, he has

- 24 -

failed entirely to demonstrate the elements of a fair-cross-section claim. *Duren*, 439 U.S. at 364. The state-court decision therefore constitutes a reasonable application of established Supreme Court precedent. Further, because no evidence of a constitutional error has been presented, Petitioner cannot demonstrate that counsel was ineffective in failing to object to the venire. *See Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004) (counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel).

## II.   Polygraph Evidence

In his second ground for habeas relief, Petitioner contends that he was deprived of his right to a fair trial when, after a prosecution witness had volunteered unsolicited evidence on cross-examination that Petitioner had agreed to take a polygraph, the trial court permitted further evidence to be introduced about whether Petitioner had taken a polygraph. In his direct appeal, Petitioner argued only that state law prohibits reference to a polygraph during a criminal trial.[4]

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S.

---

[4]Before the court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim. *See O'Sullivan*, 526 U.S. at 842; *Picard v. Connor*, 404 U.S. 270, 275-77 (1971) (cited by *Duncan v. Henry*, 513 U.S. 364, 365 (1995) and *Anderson v. Harless*, 459 U.S. 4, 6 (1982)). Petitioner clearly has failed to exhaust his due process claim in the state courts. Exhaustion is only a problem, however, if there is a state court remedy available for petitioner to pursue, thus providing the state courts with an opportunity to cure any constitutional infirmities in the state court conviction. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). If no further state remedy is available to the petitioner, exhaustion does not present a problem, but the claim is procedurally defaulted and the federal court must determine whether cause and prejudice exists to excuse the failure to present the claim in state court. *Id.* Petitioner's claim is procedurally defaulted as he already has filed his one motion for relief from judgment allowed under MICH. CT. R. 6.502(G). However, the U.S. Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)); *see also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Because the issue patently lacks merit, the Court will disregard Petitioner's apparent procedural default.

62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68.   Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68.   State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).   This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Further, under the AEDPA, the court may not grant relief merely because it would have decided the evidentiary question differently.   The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently from the Supreme Court on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).

Petitioner has not met this difficult standard.   The admission of further evidence about the circumstances surrounding Petitioner's decision not to take the polygraph violates no traditional and fundamental principle of justice.   Moreover, the Supreme Court has never concluded that the admission of evidence about a polygraph violates due process. Accordingly, the state-court's decision to admit further clarifying information about the polygraph was neither contrary to nor a

reasonable application of established Supreme Court precedent.  *See Ege v. Yukins*, 485 F.3d 364, 383 (6th Cir. 2007) ("[W]hen a habeas claim is predicated on evidentiary issues, relief depends on the existence of precedent establishing the *particular type* of evidence at issue as violating the defendant's *due process* rights.") (emphasis in original) (citing *Maldonado v. Wilson*, 416 F.3d 470, 477-78 (6th Cir. 2005) (improper admission of voice stress test is not unreasonable under AEDPA standard where no Supreme Court precedent established admission of polygraph or similar evidence as a violation of due process)).

III.  Admission of Audiotaped Statements

In his third ground for habeas relief, Petitioner challenges the admission of the audiotaped statements recorded by his wife.  Petitioner contends that, because his wife was acting as a police agent in recording the telephone calls and because she coerced his statement by threatening to leave him and cease visiting him, his statements were involuntary and their use against him violated his right to due process and his right to protection from compulsory self-incrimination under the Fifth and Fourteenth Amendments.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that the Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during "custodial interrogation" without a prior warning.  The Court has recognized, however, that the concern at issue in *Miranda* was the coercive power of the atmosphere created when police officers initiated questioning of an individual who had been taken in custody.  *Illinois v. Perkins*, 496 U.S. 292, 296 (1990).  "Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated."  *Berkemer v. McCarty*, 468 U.S. 420 (1984); *see also Perkins*, 496 U.S. at 296.  As a

result, the Court has held that *Miranda* warnings are not required when a police officer or agent questions a suspect under circumstances in which the suspect does not believe he is speaking with a police officer. *Perkins*, 496 U.S. at 296 (holding that police officer working undercover and representing himself to be a fellow prisoner is not required to give *Miranda* warnings to preserve the admissibility of a confession).

In the trial court, Petitioner raised a claim under *Miranda*, arguing that, because Paula Crawford was acting as an agent of the police, the lack of *Miranda* warnings barred the admission of his confession. Relying on *Perkins*, the trial court rejected the claim. On appeal, Petitioner challenged only the voluntariness of the confession, conceding that *Perkins*, 496 U.S. 292, barred a *Miranda* claim in the context of the case. Petitioner does not directly raise the *Miranda* claim in his habeas petition, though he cites the Fifth Amendment. Even assuming he intended to raise a *Miranda* claim, that claim is squarely barred by *Perkins*, 496 U.S. at 296.

Petitioner's challenge to the voluntariness of his confession arises under the Fourteenth Amendment.[5] The Supreme Court has held that "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton,* 474 U.S. 104, 109 (1985). The question in each of these cases is whether a defendant's will was overborne at the time he confessed. *Reck v. Pate,* 367 U.S. 433, 440 (1961); *see also Ledbetter v. Edwards,* 35 F.3d 1062, 1067 (6th Cir. 1994) ("An admission is deemed to be coerced when the conduct of law enforcement officials is such as to overbear the

---

[5]The standard of voluntariness under the Fourteenth Amendment is identical to the standard of voluntariness required to demonstrate a waiver of the privilege against self-incrimination under the Fifth Amendment. *Connelly*, 479 U.S. at 169-70.

accused's will to resist."). Coercive police activity is necessary for a confession to be found involuntary under the Due Process Clause of the Fourteenth Amendment. *See Colorado v. Connelly,* 479 U.S. 157, 167 (1986); *Clark v. Mitchell,* 425 F.3d 270, 283 (6th Cir. 2005). Unconstitutional coercion may be mental as well as physical. *Arizona v. Fulminante,* 499 U.S. 279, 287 (1991). In determining whether a defendant's will was overborne, the Court looks at the totality of the circumstances surrounding the confession. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973); *McCalvin v. Yukins*, 444 F.3d 713, 719 (6th Cir. 2006). Factors considered in assessing the totality of the circumstances include the age, education, and intelligence of the defendant; whether the defendant has been informed of his *Miranda* rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as deprivation of food or sleep. *Id.*

Federal courts repeatedly have held that "[t]rickery, deceit, even impersonation do not render a confession inadmissible, certainly in noncustodial situations and usually in custodial ones as well, unless government agents make threats or promises." *United States v. Kontny*, 238 F.3d 815, 817 (7th Cir. 2001) (citing *Frazier v. Cupp*, 394 U.S. 731, 739 (1969)); *see also United States v. Crawford*, 372 F.3d 1048, 1060-61 (9th Cir. 2004). As the Seventh Circuit observed:

> *Nothing* is more common in the noncustodial setting of police investigations than for an undercover police officer to extract a damaging admission from a criminal suspect simply by pretending to be another criminal. The admission is usable in evidence against the suspect even though he would never have spilled the beans to the officer had he known the officer's status.

*Kontny*, 238 F.3d at 817 (emphasis in original); *see also United States v. Byram*, 145 F.3d 405, 408 (1st Cir. 1998) ("trickery is not automatically coercion. Indeed, the police commonly engage in such ruses as suggesting to a suspect that a confederate has just confessed or that police have or will

secure physical evidence against the suspect.  While the line between ruse and coercion is sometimes blurred, confessions procured by deceits have been held voluntary in a number of situations"); *Ledbetter*, 35 F.3d at 1069 (neither "mere emotionalism and confusion" nor mere "trickery" will alone necessarily invalidate a confession.).

It also is well-recognized that an interrogator's appeal to the defendant's emotions generally does not constitute police coercion.  *McCall v. Dutton,* 863 F.2d 454, 460 (6th Cir. 1988) ("mere emotionalism and confusion" did not by itself constitute police coercion); *Hopkins v. Cockrell*, 325 F.3d 579 (5th Cir. 2004) (same).  This is so, even when the emotional appeal concerns the defendant's family or a loved one.  *See, e.g., United States v. Jackson*, 918 F.2d 236, 242 (1st Cir. 1990) (confession voluntary even though defendant was told that his sister was under arrest); *United States v. Haynes*, 301 F.3d 669, 684 (6th Cir. 2002) (statement voluntary despite alleged threat of legal action against defendant's girlfriend and daughter)*; United States v. Brave Heart,* 397 F.3d 1037, 1041 (8th Cir. 2005) (confession voluntary though investigator told defendant that he understood defendant's "stress and pressure" and it was unfair that his son would bear burden of responsibility for death); *Thompson v. Haley*, 255 F.3d 1292, 1296-97 (11th Cir. 2001) (confession voluntary though police told defendant that his girlfriend might go to the electric chair if he did not confess because police had probable cause to arrest girlfriend for murder).

The Michigan Court of Appeals addressed the issue at length and, applying *Connelly*, 479 U.S. at 167, held that Petitioner had failed to demonstrate the necessary coercive police conduct:

> In the present case, it is undisputed that when defendant's wife told the police that defendant made admissions to her, the police asked her to record her conversations with defendant and provided her a telephone and recording device. The trial court correctly determined that she was thus acting as a police agent in recording defendant's statements.  However, it is also undisputed that the police did

not coach her on what to say to defendant.  For a statement to be involuntary, there must be a causal connection between coercive police conduct and the confession.  See *Connelly*, *supra*, at 164.

Moreover, the undisputed testimony of defendant's wife was that she issued her "threat" to "leave" defendant before contacting the police in 1998.  At that time, defendant had been in jail for some time and was facing a lengthy prison sentence.  Furthermore, the undisputed testimony of defendant's wife was that both her intention to leave defendant and her expressed love for him were genuine.  Also, she testified that it was defendant's admission to her of abusing her daughter theat prompted her to go to the police.  None of the relational interaction between defendant and his wife was the product of exploitation by the police.  See *Id.* at 165; *Fike*, *supra* at 182.  Here, the only thing the police did was provide defendant's wife with the means to record telephone calls initiated by defendant to her home.

(8/21/01 MCOA Op. at 5, docket #29.)  In the absence of coercive police conduct, the court held that Petitioner's confession was not rendered involuntary under the federal Constitution by the use of private, nongovernmental psychological pressures.  (*Id.*)  In reaching its conclusion, the court of appeals distinguished *Lynumn v. Illinois*, 372 U.S. 528 (1963).  In *Lynumn*, the Supreme Court concluded that the defendant's statement was involuntary because it was coerced by police officers' threats to initiate state action to remove children from the mother if she did not admit to the offense.  *Id.* at 534-35.  The court of appeals held that here, in contrast to *Lynumn*, "at most, there was a threat by a private person to take personal action terminating a relationship that already had substantial impediments."  (8/21/01 MCOA Op. at 5.)

In addition, the court found that other circumstances supported a finding that the statement was fully voluntary.  In particular, the court noted that, because Petitioner was incarcerated, he could only speak to Paula Crawford by initiating a telephone conversation and having her accept it.  The court found that the "custodial barrier" created by his incarceration meant that neither he nor Paula Crawford had real power or authority over the other.  (*Id.* at 7.)  Further,

- 31 -

Petitioner acknowledged that the jail itself warned prisoners that any conversations made over the prison telephone could be monitored or recorded. On review of the totality of the circumstances, the court of appeals concluded that Petitioner's tape-recorded confession was voluntary. (*Id.*)

The court of appeals' decision was patently reasonable. The only "threat" issued by Petitioner's wife occurred well before she began to act as a police agent. *See Connelly*, 479 U.S. at 166 ("The most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause."). Moreover, the mere fact that Petitioner was emotionally invested in preserving his relationship with his wife at the time she recorded Petitioner's confession did not render his confession involuntary. *Id.* at 165-66 (requiring a causal link between the governmental coercion and the confession). I therefore conclude that the state-court's decision on Petitioner's third ground for habeas relief was neither contrary to nor an unreasonable application of established Supreme Court precedent.[6]

IV.     Due Process – Admission and Exclusion of Opinion Evidence

In his fourth ground for habeas relief, Petitioner alleges that he was denied due process and his right to present a defense when the trial court allowed prosecution witnesses to testify about issues touching on the complainant's credibility while denying Petitioner the

---

[6]Petitioner argues as a corollary that trial counsel rendered ineffective assistance by not preserving or developing the necessary record on his claim that his confession was involuntary. Petitioner raised the same sub-issue in his state-court appeal. On appeal, the Michigan Court of Appeals carefully reviewed the voluntariness issue on the merits. Finding that issue to be without merit, the court of appeals concluded that the related ineffective assistance of counsel claim was moot. Because the voluntariness issue was treated as properly preserved by the court of appeals, the basis for Petitioner's habeas claim of ineffective assistance is difficult to comprehend. In any event, because the voluntariness claim is both meritless and preserved, Petitioner can demonstrate neither prong of an ineffective assistance of counsel claim. *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984) (holding that to establish a claim of ineffective assistance of counsel, the petitioner must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome).

opportunity to solicit opinion testimony from other witnesses.  In his brief on appeal to the Michigan Court of Appeals, Petitioner complained that Detective Westmoreland was permitted to testify that in her three years of experience with criminal sexual conduct cases she had observed the reactions of mothers to their children's accusations. Westmoreland testified that she did not find it unusual for Paula Crawford to disbelieve her daughter, as she saw such situations "all the time" when the mother was caught between the child and a significant other.  (Tr. IV, 125-26.)  She also testified that she did not find it unusual that Nydia delayed in reporting the conduct. (Tr. IV, 126-27.) Westmoreland also was permitted to be questioned on rebuttal about whether, in her experience, emotional threats of loved ones typically succeeded in eliciting a confession, to which she answered, "No."  (Tr. V, 29-31.)

In contrast, Petitioner argued that defense solicitations of opinion from Detectives Headworth and Westmoreland were disallowed.   Specifically, he complains that Detective Westmoreland was asked but not allowed to answer the following question: "Do you find it suspect that [the tape recording of conversations] took place around the Christmas holidays, that he was somewhat vulnerable and emotional at that point in time?" (Tr. V, 18).  Similarly, he complains that Detective Headworth was not allowed to answer the last of the following series of defense questions:

Q      Didn't you find that unusual that they weren't upset?

A      No.

Q      That's not unusual?

A      No.

Q      It wouldn't be unusual if it weren't true, correct?  If the allegations weren't true, it wouldn't be unusual that someone's not upset?

THE COURT:  Come on, Mr. Nunzio, let's get to dealing with facts here, not making closing arguments.

MR. NUNZIO:  I'll move on, your Honor.

THE COURT:  Benson and I had a long discussion yesterday about how lawyers don't seem to understand that questions are for evidence, not for argument.

(Tr. V, 40.)

Petitioner argued that the disparate application of Michigan Rules of Evidence 602 and 701 constituted a violation of his due process right under the Fourteenth Amendment to a fair trial.  He also argued that, by mechanically applying the evidentiary rules, the court had deprived Petitioner of his right to present a defense under the Sixth and Fourteenth Amendments.

The admission or exclusion of evidence under state law is not the proper subject of habeas review.  *Estelle*, 508 U.S. at 67-68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour*, 224 F.3d at 552; *accord Coleman*, 268 F.3d at 439.  In addition, on habeas review, the court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts.  *Sanders*, 221 F.3d at 860.

The Michigan Court of Appeals addressed the due process claim as follows:

- 34 -

Defendant next argues that the trial court denied him a fair trial by granting the prosecutor great latitude when questioning witnesses and on the other hand holding defense counsel on a short leash. Defendant's argument is without merit. The trial court did not abuse its discretion in admitting or excluding the evidence that defendant claims to be error. See [*People v.*] *Starr*, [577 N.W.2d 673, 675 (Mich. 1998)]. The trial court afforded defendant the opportunity to present a defense, and accorded defendant's due process right to a fair trial. See *People v Stanaway*, 466 Mich 643, 662-664; 521 NW2d 557 (1994); *People v Mosko*, 441 Mich 496, 503; 495 NW2d 534 (1992). "We require a fair trial, not a perfect trial." *Id.*, quoting *People v Beach*, 429 Mich 450, 491; 418 NW2d 861 (1988). Furthermore, even if the trial court erred by admitting or excluding evidence, reversal is not required because, after an examination of the entire cause, it does not affirmatively appear more probable than not that any such error was outcome determinative. See *Smith*, *supra*, at 680, quoting [*People v.*] *Lukity*, [596 NW2d 607, 613] (Mich. 1999)].

(8/28/01 MCOA Op. at 7.)  The Michigan Court of Appeals properly applied applicable Supreme Court authority to conclude that Petitioner's due process rights were not impaired. *See Stanaway*, 521 N.W.2d at 567-68 (citing federal due process law). With respect to the question posed to Detective Headworth, Petitioner had no legitimate interest in having the final question answered. Headworth had already twice answered defense counsel's question about whether the response of the victim and her mother to the initial decision not to prosecute was unusual. He had testified that it was not unusual. Counsel thereafter asked him to speculate that the response was only normal if the accusations had been untruthful in the first instance. While Headworth could testify about whether the reaction was unusual based on his experience, it would be entirely beyond his ability to know the reasons why various complainants had a similar response to hearing that a case was not being prosecuted. Similarly, the question defense counsel directed to Westmoreland asked her to give an opinion about the increased vulnerability of individuals to family influences at holiday time. Westmoreland was not qualified by her experience as a police officer to testify to such relative psychological vulnerability. As a result, the character of defense counsel's opinion question was

entirely different from those asked by the prosecution, which solely sought opinion about comparative behavior and reactions of the victim in this case with victims in other cases. Petitioner therefore falls far short of demonstrating that the exclusion of the solicited opinion evidence violates some fundamental principle of justice. The state court's determination of this issue was an entirely reasonable application of established Supreme Court precedent.

　　　　　To the extent Petitioner contends that he was deprived of his right to present a defense, his claim is equally meritless. "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *see also Crane v. Kentucky*, 476 U.S. 683, 689-690 (1986); *Marshall v. Lonberger*, 459 U.S. 422, 438, n. 6 (1983); *Chambers v. Mississippi*, 410 U.S. 284, 302-303 (1973); *Spencer v. Texas*, 385 U.S. 554, 564 (1967). This latitude, however, has limits. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane*, 476 U.S. 690 (citations omitted). This right is abridged by evidence rules that "infring[e] upon a weighty interest of the accused" and are "'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Scheffer*, 523 U.S. at 308 (quoting *Rock v. Arkansas*, 483 U.S. 44, 58, 56 (1987)).

　　　　　As with the due process prong of Petitioner's habeas claim, the state court applied the applicable Supreme Court authority to Petitioner's claim that the evidentiary exclusion violated his right to present a defense. *See Stanaway*, 521 N.W.2d at 567-68 (citing federal due process law and law concerning the right to present a defense). Further, for the reasons previously discussed,

Petitioner had ample ability to present his defense, which was not impaired by the trial court's decision to exclude speculative opinion evidence on a tangential point.

Moreover, even assuming the exclusion of the opinion error in issue was erroneous, the error was harmless.  On habeas review, a court must assess harmlessness under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), regardless of whether the state appellate court recognized the error and reviewed it for harmlessness.[7]  *See Hargrave*, 248 F. App'x at 738 (citing *Fry v. Pliler*, 127 S. Ct. 2321, 2328 (2007)); s*ee also Vasquez*, 496 F.3d at 574-75.  The *Brecht* standard requires the Court to consider whether the constitutional error in the state criminal trial had a "substantial and injurious effect" on the result.  *Brecht*, 507 U.S. at 638.  In determining whether the restriction was harmless, a court must consider a number of factors, "'includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'" *Hargrave*, 248 F. App'x at 728 (quoting *Van Arsdall*, 475 U.S. at 684).  Here, even assuming the exclusion of evidence was erroneous, the exclusion was harmless.  The evidence, including Petitioner's own recorded statements, was substantial.  Petitioner attempted to suggest that he had lied about sexually assaulting his step-daughter in order to preserve his marriage.  The theory was highly unlikely, but Petitioner introduced evidence of the October threat by his wife, and he had ample opportunity to drive home his theory during closing argument.  The

---

[7]In the instant case, the court of appeals concluded that any error was harmless.  (*See* 8/28/01 MCOA Op. at 7.)  However, the standard applied by the state court was distinct from the standard applied on habeas review under *Brecht*, 507 U.S. at 638.

opinion testimony sought by Petitioner could have made no difference to the jury under the facts of the case.

For all these reasons, I recommend that Petitioner's fourth ground for habeas relief be denied.

V.    Ground 5:  Cumulative Error

In his final ground for habeas review, Petitioner argues that, even if the alleged independent errors do not warrant habeas relief, taken together, their cumulative effect warrants such relief.   Under the AEDPA, a court only may grant habeas relief based on a misapplication of Supreme Court law. *Bailey*, 271 F.3d at 655.  The Sixth Circuit repeatedly has stated that cumulative error claims are not cognizable on habeas review.   "The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief." *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002); *see also Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006);  *Keith v. Mitchell*, 455 F.3d 662, 679 (6th Cir. 2006); *Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004); *Millender v. Adams,* 376 F.3d 520, 529 (6th Cir. 2004); *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir. 2002).  Moreover, because I concluded above that the individual claims are without merit, Petitioner cannot show that any cumulative error violated his constitutional rights.  *See Seymour*, 224 F.3d at 557.

**Recommended Disposition**

For the foregoing reasons, I recommend that the habeas corpus petition be denied.

Dated:   January 26, 2009                          /s/  Joseph G. Scoville
                                                   United States Magistrate Judge

- 38 -

## **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).